UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



ROBERT E. PETTIBONE,

        Plaintiff,

-v-

WB MUSIC CORP. *and*
WARNER/CHAPPELL MUSIC, INC.,

        Defendants.

No. 17-cv-2569 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Robert Pettibone brings this action for breach of contract and declaratory judgment against Defendants WB Music Corp. and Warner/Chappell Music, Inc. (collectively, "Warner"). Now before the Court are (1) Warner's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and (2) Pettibone's cross-motion for summary judgment on the same claims pursuant to Rule 56. For the following reasons, Warner's motion to dismiss is GRANTED and Pettibone's motion for summary judgment is DENIED as moot.

I. BACKGROUND

A. Facts[1]

This case arises from a dispute over whether Pettibone must indemnify Warner for attorneys' fees and costs incurred by Warner in defending against a third-party lawsuit for copyright infringement. On June 1, 1990, Pettibone entered into an exclusive copyright administration agreement (the

---

[1] The following facts are drawn from the Complaint, filed on April 10, 2017 (Doc. No. 1 ("Complaint" or "Compl.")), the parties' copyright administration agreement, which is attached to the Complaint as an exhibit (Doc. No. 1-1 ("Agreement")), and Warner's errors-and-omissions insurance policy, which is incorporated by reference into the Complaint (Doc. No. 26-2 ("Policy")). *See Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (noting that on a motion to dismiss, courts may consider documents attached to or incorporated by reference into the complaint). In ruling on Warner's motion, the Court has also considered Warner's memorandum of law (Doc. No. 25 ("Mem.")), Pettibone's opposition (Doc. No. 28 ("Opp'n")), Warner's reply (Doc. No. 28 ("Reply")), and Pettibone's surreply (Doc. No. 33 ("Surreply")).

"Agreement") with Warner regarding Pettibone's interest in the song "Vogue," which he co-wrote and composed with the pop star commonly known as Madonna. (Compl. ¶ 8; Agreement § 3.) Section 6 of the Agreement requires Warner to pay regular royalties to Pettibone. (Compl. ¶ 8; Agreement § 6.) Section 7 contains, among other things, Pettibone's representation and warranty that "Vogue" – referred to in the Agreement as the "SC" – "does not infringe the rights of any third party . . . including, but not limited to copyright[.]" (Compl. ¶ 9; Agreement § 7.1.) And Section 8.1 contains the following indemnification clause, which is the subject of the present dispute:

> Each party will indemnify the other against any loss or damage (including court costs and reasonable attorneys' fees) due to a breach of this agreement by that party which results in a judgment against the other party or which is settled with the other party's prior written consent (not to be unreasonably withheld). In addition, your [Pettibone's] indemnity shall extend to the "deductible" under our errors-and-omissions policy without regard to judgment or settlement. Each party is entitled to be notified of any action against the other brought with respect to the SC, and to participate in the defense thereof by counsel of its choice, at its sole cost and expense. In the event that one of us refuses to approve a settlement which the other party considers reasonable, the party refusing its consent shall assume the further defense of the subject claim, action or proceeding.

(Compl. ¶ 10; Agreement § 8.1.) The Agreement further provides, in relevant part, that "[i]f a claim is made against [Warner], [Warner] may withhold a reasonable amount from monies due or come due to [Pettibone], but [Warner] will refund it . . . if (and to the extent that) suit is not brought with respect to the sum within 1 year thereafter[.]" (Compl. ¶ 10; Agreement § 8.2.) Pursuant to the Agreement's choice-of-law provision, the Agreement must be interpreted in accordance with New York law. (Agreement § 10.)

On July 11, 2012, the music company VMG Salsoul, LLC ("VMG") filed a complaint in the United States District Court for the Central District of California alleging that Pettibone had copied a portion of the song "Love Break" and used it without authorization in "Vogue," thereby committing copyright infringement. (Compl. ¶ 14; *VMG Salsoul, LLC v. Ciccone*, No. 12-cv-05967 (BRO) (CWX), 2013 WL 8600435, at *2 (C.D. Cal. Nov. 18, 2013).) The complaint named as defendants Pettibone, Madonna, Warner, and others. (Compl. ¶ 14.) Working together, but with Warner represented by

2

separate counsel, the defendants in that action moved for summary judgment on the infringement claims. (*Id.* ¶¶ 15, 38.) The court granted the motion, ruling that there was no copyright infringement as a matter of law, and awarded the defendant a total of $670,117.25 in attorneys' fees and $50,055 in costs. (*Id.* ¶¶ 16–17.) On June 2, 2016, the United States Court of Appeals for the Ninth Circuit affirmed the order granting summary judgment, but vacated the award of attorneys' fees and costs and remanded to the district court for reconsideration. (*Id.* ¶ 18; *VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871 (9th Cir. 2016).) On remand, the district court declined to award attorneys' fees and costs. (Compl. ¶ 20.)

Having vanquished their common opponent in the VMG lawsuit, but having failed to obtain relief for their litigation expenses, Pettibone and Warner then turned on each other over who must foot the bill for their fees and costs. During the pendency of the VMG suit, Warner – relying on Section 8.2 of the Agreement – had withheld royalties otherwise due to Pettibone to cover the costs of its defense. (*See* Compl. ¶¶ 10, 22–24.) When Pettibone demanded the royalties, Warner refused to hand them over, citing Pettibone's indemnification obligation under Section 8.1 of the Agreement. (*See id.* ¶ 23.) Based on past royalty payments, Pettibone estimates that the unpaid royalties amount to more than $500,000, though the Complaint does not specify an exact figure. (*Id.* ¶ 22.)

B. Procedural History

Pettibone filed his complaint in this action on April 10, 2017, bringing claims for breach of contract and declaratory judgment. (Doc. No. 1.) On May 31, 2017, Warner filed a pre-motion letter in anticipation of its contemplated motion to dismiss. (Doc. No. 11.) Pettibone filed his response a few days later (Doc. No. 13), and the Court held a pre-motion conference on July 11, 2017 (Doc. No. 22). At the conference, Pettibone agreed with the Court that his declaratory judgment claim was substantively duplicative of his breach of contract claim, and that the proper vehicle for him to seek judgment as a matter of law would instead be a motion for summary judgment. (Doc. No. 22 at 28–29.) The Court then set a briefing schedule for the parties' contemplated motions. (*Id.* at 37–40.) Now before the Court

3

are Warner's motion to dismiss, filed on July 27, 2017 (Doc. No. 25) and fully briefed on September 18, 2017 (Doc. No. 30), and Pettibone's cross-motion for summary judgment, which also serves as his brief in opposition, filed on August 28, 2017 (Doc. No. 28) and fully briefed on October 13, 2017 (Doc. No. 33).

## II. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must "provide the grounds upon which [the] claim rests[.]" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

## III. DISCUSSION

### A. Breach of Contract

Under New York law, the elements of breach of contract are: "(1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Centre St. Realty LLC*, 156 F. App'x 349,

4

350–51 (2d Cir. 2005). Only the third element is disputed here. The parties agree that Warner has withheld royalty payments that are ordinarily due to Pettibone; the question is whether the plain language of the Agreement entitles Warner to do so, which in turn depends on how one interprets Pettibone's obligations under the indemnity clause in Section 8.1.

In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (internal quotation marks and citation omitted). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). Under New York law, a contract is ambiguous if it is susceptible of more than one reasonable interpretation. *Neopharm Ltd. v. Wyeth-Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016). In contrast, "[a] contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." *Keiler v. Harlequin Enterprises Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014). If a contract is unambiguous, a court may construe it as a matter of law. *Metro. Life Ins. Co. v. RJR Nabisco Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). "Contracts should be read as a whole to determine whether an ambiguity exists." *Hirth v. Am. Ins. Co.*, No. 15-cv-3245 (GWG), 2016 WL 75420, at *3 (S.D.N.Y. Jan. 7, 2016) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir. 1996)). Although courts must "strive to resolve any contractual ambiguities in [plaintiff's] favor," *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995), "the language of a contract is not made ambiguous simply because the parties urge different interpretations," *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d Cir. 2005) (citation and internal quotation marks omitted). Moreover, a court should not find language ambiguous on the basis of the interpretation urged by one party where that interpretation would "strain the contract language beyond its reasonable and ordinary meaning." *Metro. Life*, 906 F.2d at 889.

5

Here, according to Warner, the Agreement clearly obligates Pettibone to indemnify Warner for expenses incurred in defending against VMG's copyright-infringement lawsuit. (Mem. at 6.) The first sentence of the indemnity clause provides that "[e]ach party will indemnify the other against any loss or damage (including court costs and reasonable attorneys' fees) due to a breach of this agreement by that party which results in a judgment against the other party or which is settled with the other party's prior written consent (not to be unreasonably withheld)." (Agreement § 8.1.) That provision is clearly inapplicable here because Pettibone was not found to have committed copyright infringement and therefore did not breach the Agreement. (Compl. ¶¶ 16, 18.) However, the second sentence of the indemnity clause provides that "[i]n addition, [Pettibone's] indemnity shall extend to the 'deductible' under [Warner's] errors-and-omissions policy without regard to judgment or settlement." (Agreement § 8.1.) Warner's errors-and-omissions policy, in turn, has a deductible (termed a "retention" in the Policy) for "claims expenses," including reasonable attorneys' fees and costs incurred in defending against a lawsuit, of up to $1.5 million.[2] (Doc. No. 26-2 at 2, 8–10.) Thus, Warner argues – and the plain language of the Agreement, considered as an integrated whole, appears to confirm – that Pettibone has a limited, additional indemnity that applies when he is accused of a breach, but no actual breach is found or conceded.

Pettibone makes several arguments in response. First, he contends that under New York law, a provision for indemnification of attorneys' fees is enforceable only when the language of the contract is "*unmistakably* clear," as opposed to merely "clear." (Opp'n at 8 (citing *Bridgestone/Firestone Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20–21 (2d Cir. 1996) (emphasis added).) The authority that

---

[2] Although Pettibone attempts to argue that a "retention" is technically distinguishable from a "deductible," the only difference he identifies is one of timing; whereas a deductible is ultimately subtracted from the amount covered, a retention is a threshold amount that must be met before coverage applies in the first place. (*See* Opp'n at 18–19.) As Warner points out, that distinction is irrelevant here because both terms refer to the amount for which Warner would be responsible under the Policy, which does not contain any separate provision for a "deductible." (Reply at 12.) Moreover, Warner argues persuasively that the terms are often used interchangeably. *See, e.g., Allstate Ins. Co. v. Am. Home Insurance Co.*, 837 N.Y.S.2d 138, 146 n.2 ("In the insurance context, the terms retention and deductible . . . are used interchangeably.")

6

Pettibone cites for this standard, however, involves provisions for fee-shifting between the contracting parties themselves (i.e., first-party suits), rather than indemnification of fees incurred in defending against claims brought by non-contracting parties (i.e., third-party suits). That distinction matters because "the default presumption" in New York is "that indemnification involves liabilities, losses, or claims associated with third-party suits," rather than damages or losses "between the contracting parties themselves." *BNP Paribas Mortg. Corp v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415–16 (S.D.N.Y. 2011). In light of that presumption, courts require that provisions for first-party indemnification be "unmistakably clear." *See, e.g., Bridgestone/Firestone*, 98 F.3d at 20–21 (noting that while "the [indemnity] language may easily be read" to apply to "third party actions," it was not "unmistakably clear" that the parties intended it to apply to actions between themselves). Here, of course, Warner is attempting to recover fees arising from a dispute with VMG, a third party. Thus, the heightened standard for first-party indemnification is inapposite; to establish Pettibone's obligation as a matter of law, the Agreement need only be "clear," in accordance with general rules of contract interpretation. *See Bradley v. Earl B. Feiden, Inc.*, 8 N.Y.3d 265, 274–75 (N.Y. 2007).

Second, Pettibone contends that the Agreement's indemnity clause is, at minimum, ambiguous because it does not contain language pertaining to "claims" or "allegations." (Opp'n at 8.) Although the second sentence of the clause provides that Pettibone's additional indemnity applies "without regard to judgment or settlement," it does not specify that it also applies "without regard to breach." Thus, Pettibone says, he is completely off the hook for litigation expenses unless he has actually breached.

To be sure, the Agreement could have been more carefully drafted. For instance, it could have expressly stated that Pettibone's additional indemnity applied "without regard to breach, judgment, or settlement." Given that a breach is typically found in a judgment or conceded in a settlement, however, the phrase "without regard to judgment or settlement" strongly implies that Pettibone's additional indemnity is not contingent on an actual breach. Hypothetically, the parties could have contemplated a

7

separate, follow-on proceeding to determine breach, but that interpretation is highly implausible, in part because there is no provision for such an unorthodox arrangement in the Agreement, and in part because finding that Pettibone breached would presumably risk exposing Warner, his business partner, to downstream liability. It seems equally unlikely that Pettibone's additional indemnity was designed to cover only the rare scenario in which a court finds breach, but the lawsuit terminates without judgment or settlement. Indeed, Pettibone himself does not argue otherwise. Moreover, contracts "must be read as a whole to determine whether an ambiguity exists." *Hirth*, 2016 WL 75420, at *3 (citing *Readco*, 81 F.3d 295, 300). Warner's insurance policy, which is incorporated into the indemnity clause by reference, expressly refers to "claims expenses," including attorneys' fees and costs incurred in defending against lawsuits for copyright infringement. (Doc. No. 26-2 at 10, 15.) Thus, especially when read in conjunction with the Policy, the Agreement leaves little room for doubt that Pettibone's additional indemnity extends to expenses incurred in defending against lawsuits like the one brought by VMG, though only up to the deductible (or retention) in the Policy.

Next, for what appears to be the first time in this litigation, Pettibone contends that "the second sentence [of the indemnity clause] merely states the total limits of potential liability [that Pettibone] would owe in the event there is a breach regardless of how that breach is found, by judgment or by settlement." (Opp'n at 12.) This interpretation is even more strained. For one thing, the second sentence of the clause begins with the words "[i]n addition," which indicates an expansion, not a limitation, of Pettibone's indemnity. (Agreement § 8.1.) And if the parties had intended to subtract from Pettibone's indemnity, rather than augment it, the phrase "without regard to judgment or settlement" would also serve little purpose. Pettibone's novel reinterpretation pays little heed to the maxim that contracts should be interpreted so as not to leave "a part unreasonable or of no effect." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

8

Finally, Pettibone attempts to rely on the third sentence of the indemnity clause, which states that "[e]ach party is entitled to be notified of any action against the other brought with respect to the SC, and to participate in the defense thereof by counsel of its choice, at its sole cost and expense." (Agreement § 8.1.) According to Pettibone, that means that, absent a breach, each party is always responsible for its own fees and costs. (Opp'n at 15–1.) But as Warner points out, that provision clearly contemplates a situation in which only one of the parties is sued; hence the requirement that each party notify the other of the action. Indeed, that is how Pettibone appears to have interpreted this sentence in his complaint. (Compl. ¶ 13 ("In the event there is an action brought against *one party*, Section 8.1 of the Agreement provides that each party may 'participate in the defense thereof by counsel of its choice, at its sole cost and expense.'") (emphasis added).) Thus, that provision has no bearing where, as in the VMG lawsuit, *both* parties are sued.

In sum, although the parties urge conflicting interpretations of the Agreement, Pettibone's interpretation would "strain[ ] the contract language beyond its reasonable and ordinary meaning." *Metro. Life*, 906 F.2d at 889. Because the Court finds that the Agreement unambiguously requires Pettibone to indemnify Warner for the attorneys' fees and costs it incurred in defending against the VMG lawsuit, up to the $1.5 million retention in the Policy, Warner did not breach the Agreement by withholding royalties otherwise due to Pettibone pursuant to Section 8.2 of the Agreement. Pettibone's breach-of-contract claim must therefore be dismissed.

### B. Declaratory Judgment

"A declaratory judgment serves no 'useful purpose' when it seeks only to adjudicate an already-existing breach of contract claim." *Torchlight Loan Servs., LLC v. Column Fin., Inc.*, No. 11-cv-7426 (RWS), 2012 WL 3065929, at *12–13 (S.D.N.Y. July 25, 2012) (granting motion to dismiss declaratory judgment claim). As the Court explained at the pre-motion conference, Pettibone's claim for a declaratory judgment that "there is no indemnification required" (Compl. ¶ 48) serves no purpose here,

since – as Pettibone conceded – it is entirely duplicative of his contract claim. (Doc. No. 22 at 28–29.) In any event, since the Court has rejected Pettibone's interpretation of the Agreement, this claim must also be rejected on the merits. Accordingly, the declaratory judgment claim is dismissed.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT Warner's motion to dismiss the Complaint is GRANTED. Pettibone's cross-motion for summary judgment is therefore DENIED as moot. *See New York City Dep't of Educ. v. S.S.*, No. 09-cv-810 (CM), 2010 WL 983719, at *17 (S.D.N.Y. Mar. 17, 2010). The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 24 and 27 and to close this case.

SO ORDERED.

Dated: March 21, 2018
New York, New York

_____
RICHARD J. SULLIVAN
United States District Judge